FILED
CLERK, U.S. DISTRICT COURT

DEC – 1 2010

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAMIEN TEVES DOSTER, | NO. ED CV 10-707-VBF(E) |
| Petitioner, | |
| v. | ORDER ADOPTING FINDINGS, |
| K. HARRINGTON, Warden, | CONCLUSIONS AND RECOMMENDATIONS |
| Respondent. | OF UNITED STATES MAGISTRATE JUDGE |

Pursuant to 28 U.S.C. section 636, the Court has reviewed the Petition, all of the records herein and the attached Report and Recommendation of United States Magistrate Judge. The Court approves and adopts the Magistrate Judge's Report and Recommendation.

IT IS ORDERED that Judgment be entered denying and dismissing the Petition with prejudice.

///
///
///
///

1     IT IS FURTHER ORDERED that the Clerk serve copies of this Order,

2 the Magistrate Judge's Report and Recommendation and the Judgment

3 herein by United States mail on Petitioner, and counsel for

4 Respondent.

5

6     LET JUDGMENT BE ENTERED ACCORDINGLY.

7

8     DATED: _____12-1-10_____, 2010.

9

10

11

                   VALERIE BAKER FAIRBANK

12         UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11  DAMIEN TEVES DOSTER,            ) NO. ED CV 10-707-VBF(E)
                                    )
12                 Petitioner,      )
                                    )
13       v.                         ) REPORT AND RECOMMENDATION OF
                                    )
14  K. HARRINGTON, Warden,          ) UNITED STATES MAGISTRATE JUDGE
                                    )
15                 Respondent.      )
                                    )
16  _____)

17

18       This Report and Recommendation is submitted to the Honorable

19  Valerie Baker Fairbank, United States District Judge, pursuant to the

20  provisions of 28 U.S.C. section 636 and General Order 05-07 of the

21  United States District Court for the Central District of California.

22

23                            PROCEEDINGS

24

25       Petitioner filed a "Petition for Writ of Habeas Corpus By a

26  Person in State Custody" on May 11, 2010.   Respondent filed an Answer

27  on June 2, 2010.   Petitioner filed a Traverse on July 21, 2010.

28  ///

**BACKGROUND**

An Information charged Petitioner with the first degree murder of Damon Mabins, and alleged that, in the commission of the murder, Petitioner personally and intentionally discharged a firearm and proximately caused great bodily injury within the meaning of California Penal Code sections 12022.53(d) and 1192.7(c)(8) (Clerk's Transcript ["C.T."] 43-44). The Information also charged Petitioner with the attempted murder of Melvin Banks and with being a felon in possession of a firearm (C.T. 43-44). The Information further alleged that Petitioner had suffered a prior conviction for which he had served a prison term within the meaning of California Penal Code section 667.5(b) (C.T. 44).

A jury found Petitioner guilty of the second degree murder of Mabins and found true the firearm enhancement allegations (Reporter's Transcript ["R.T."] 424-45; C.T. 165, 167-68). The jury also found Petitioner guilty of having been a felon in possession of a firearm (R.T. 425; C.T. 165). The jury acquitted Petitioner of the attempted murder (R.T. 424-25; C.T. 169). Petitioner admitted the prior prison term allegation (R.T. 428; C.T. 165). Petitioner received a sentence of 43 years to life (R.T. 443-44; C.T. 223-30).

The Court of Appeal affirmed the judgment (Respondent's Lodgment 7; see People v. Doster, 2008 WL 4840984 (Cal. App. Nov. 10, 2008). The California Supreme Court summarily denied Petitioner's petition for review (Respondent's Lodgment 9).

///

1                        **SUMMARY OF TRIAL EVIDENCE**

2

3        The following summary is taken from the opinion of the California

4 Court of Appeal in <u>People v. Doster</u>, 2008 WL 4840984 (Cal. App.

5 Nov. 10, 2008).  <u>See</u> <u>Slovik v. Yates</u>, 556 F.3d 747, 749 n.1 (9th Cir.

6 2009) (taking factual summary from state appellate decision); <u>see also</u>

7 28 U.S.C. § 2254(e)(1) ("a determination of a factual issue made by a

8 State court shall be presumed to be correct").

9

10     A.   *Prosecution*

11

12        On September 2, 2005, Thurman Schisler was working at

13     the In-N-Out Burger restaurant located at the corner of

14     Hemlock Avenue and Pigeon Pass Road in Moreno Valley.

15     Sometime between 11:00 p.m. and 12:00 a.m., a large crowd

16     (30 to 50 people) gathered in the parking lot.  Most of the

17     members of the crowd were teenagers or in their early 20's.

18     The police were called, and they dispersed the crowd.

19

20        Sometime in the evening of September 2, 2005, Rasheed

21     Muslim met up with [Petitioner] and Shariff Garrett, who

22     were in Garrett's sports utility vehicle (SUV).  At that

23     time, Garrett asked Muslim if he had a gun, and Muslim told

24     him no.  Muslim got into the backseat of Garrett's SUV.

25     They all drove to a club in Colton but did not go in.  They

26     then drove to the Moreno Valley In-N-Out Burger.

27 ///

28 ///

3

1    As Muslim, Garrett, and [Petitioner] were walking into
2    the restaurant, they encountered a crowd of young people
3    whom Muslim did not know.  Garrett got into a verbal
4    confrontation with someone in the crowd.  The man said
5    something about shooting Garrett.  Garrett responded, "They
6    didn't stop making guns when they made yours."  Garrett
7    started walking back to the SUV; Muslim believed it was to
8    retrieve a gun that Garrett kept in the center console.  The
9    man from the crowd screamed to his friends to get a gun.

10

11    Garrett leaned into the SUV.  Another man then ran up
12    and shot Garrett in the back of the head.  Muslim tried to
13    go toward Garrett to help him, but the man shot him in the
14    leg.  Muslim ran inside the restaurant.  Muslim had no idea
15    about [Petitioner's] whereabouts during or after the
16    shooting.

17

18    Schisler was in the back room of the restaurant when he
19    heard at least three "popping" sounds.  Schisler then heard
20    employees from the kitchen area screaming.  When Schisler
21    entered the kitchen, Muslim was leaning on a wall.  Muslim
22    told Schisler he had been shot in the leg.  Schisler wrapped
23    the leg and waited for paramedics.

24

25

26

27

28

4

1      That same night, Damon Mabins and Melvin Banks[1] were

2      driving by the In-N-Out Burger and observed a group of

3      people outside in the parking lot.  Mabins slowed down.

4      Just then, Banks observed a Black man chasing after another

5      man, later discovered to be Garrett, who was one of Mabins's

6      friends.  Banks saw the man chase Garrett and shoot Garrett

7      in the head.  Mabins then told Banks that he might have

8      known the man who had been shot; he wanted to go back.

9

10      Banks drove up and stopped either next to or behind

11      Garrett's SUV.  Mabins walked up to Garrett, who was lying

12      on the ground.  He called to Banks to come over.  Mabins

13      bent over Garrett's body.  There was no one else near the

14      body.

15

16      As they were standing near Garrett's body, [Petitioner]

17      came out of nowhere and shot Mabins.  Banks could not recall

18      if [Petitioner] came from inside the truck or a grass area

19      in front of the truck.  Banks ran.  At trial, Banks admitted

20      that he had told police after the shots were fired at Mabins

21      that he heard a clicking sound from the gun before he ran.

22      He denied he ever told police that [Petitioner] pointed the

23      gun at him when he heard the clicking sound.

24    ///

25    ///

26    _____

27      [1]    Melvin Banks was in custody at the time of his
testimony for attempted murder in a different case.
28

1    Maria Sneed was inside the In-N-Out Burger restaurant

2    and heard what sounded like firecrackers outside.  Muslim

3    then walked into the restaurant limping.  Sneed looked out

4    the window and saw a man shooting another man who was lying

5    on the ground.  While the man was lying on the ground, Sneed

6    observed the other man shoot him at least four times.  She

7    then saw the shooter run away.  Mabins and Garrett ended up

8    lying on the ground 10 feet from each other.

9

10    Banks told police officers who spoke with him after the

11    incident that [Petitioner] jumped out of the bushes that

12    were in front of the SUV and shot Mabins.  He also told

13    officers that [Petitioner] had pointed the gun directly at

14    him, and he heard a click.

15

16    Earlier in the evening, Riverside County Sheriff's

17    Deputy Aron Wolfe had responded to the In-N-Out Burger

18    restaurant to break up a disturbance.  Some people in the

19    crowd appeared to be ready to get into a fight, and Deputy

20    Wolfe and other officers ordered them to disperse.  The

21    parking lot was cleared.

22

23    When Deputy Wolfe returned to the area in response to

24    the shooting, he encountered [Petitioner] at a nearby gas

25    station.  [Petitioner] was running, and Deputy Wolfe ordered

26    him to stop.  [Petitioner] did not seem agitated and was

27    calm.  [Petitioner] told Deputy Wolfe that he was inside the

28    In-N-Out Burger restaurant when he heard a round of

1   gunshots.  When [Petitioner] heard a second round of

2   gunshots, he exited the In-N-Out Burger and started running

3   away to avoid being shot.

4

5      [Petitioner] was interviewed by Detective Gary LeClair

6   on September 4, 2005, at the police station.  The shoes

7   [Petitioner] was wearing at the interview were matched to

8   shoeprints found in blood at the scene.  The blood belonged

9   to Garrett.[2]

10

11      An autopsy was performed on Mabins on September 7,

12   2005. He died as a result of five gunshot wounds.  Mabins

13   was shot from a distance of one to three feet.  Based on the

14   gunshot wounds, it was conceivable Mabins had been lying on

15   the ground when he was shot, depending upon the location of

16   the shooter.

17

18      A .38-caliber gun was found in the center console

19   storage area of the SUV.  In addition, .32- and .38-caliber

20   shell casings and live rounds were found at the scene.

21   During the autopsy performed on Garrett, .32-caliber bullets

22   were recovered from his body; .38-caliber bullets were

23   recovered from Mabins['s] body.  All of the .32-caliber

24   casings and bullets recovered from the scene were from the

25

26   ―――――――――――――

       [2]   On rebuttal, the prosecution presented evidence that

27  [Petitioner] lied to police that the shoes he had on during the
interview were the ones he wore during the shooting.

28

7

1   same gun.  A .38-caliber bullet recovered from Mabins's body

2   during the autopsy matched the .38-caliber gun found in the

3   center console of Garrett's SUV.

4

5   B.  *Defense*

6

7   [Petitioner] testified on his own behalf as follows.[3]

8

9       Muslim, Garrett, and [Petitioner] all got together

10  between 10:30 or 11:00 p.m. on September 2, 2005.  Sometime

11  in the evening, Garrett wanted to go to the In-N-Out Burger.

12

13      When they got to the In-N-Out Burger, Garrett parked

14  near a large crowd of people.  As the three of them were

15  walking to the restaurant, Garrett got into an argument with

16  someone in the crowd.  When Garrett walked back to his car

17  and leaned in (presumably to get a gun he kept in the center

18  console), he got shot in the back of the head by someone

19  from the crowd.  [Petitioner] ran and hid.  [Petitioner]

20  came back and got in the truck with Garrett to try to hold

21  him up to stop the bleeding.  [Petitioner] found a gun on

22  the seat and picked it up.

23

24      [Petitioner] heard footsteps behind him and saw someone

25  walking toward the truck.  He panicked.  He thought he was

26  _____

27      [3]  At the time of the shooting, [Petitioner] was on parole
    for a conviction of child endangerment.

28

8

1  going to get killed. [Petitioner] was still holding onto

2  Garrett and dropped him; Garrett fell to the ground.

3  [Petitioner] started shooting. He then threw the gun back

4  in the truck and ran.[4]

5

6      [Petitioner] lied to the police after the shooting

7  because he was afraid and confused. He claimed he never saw

8  Banks, even though he told police prior to trial that he saw

9  Banks approach him. [Petitioner] denied that he had been at

10  the In-N-Out Burger during the initial crowd disturbance or

11  that Garrett and Muslim had had a discussion about guns.

12

13  (Respondent's Lodgment 7, at pp. 3-8; see People v. Doster, 2008 WL

14  4840984, at *2-4) (original footnotes renumbered).

15

16                          **PETITIONER'S CONTENTIONS**

17

18  Petitioner contends:

19

20  1.   The trial court allegedly erred in failing to instruct the

21  jury sua sponte on the defense of unconsciousness;

22

23  2.   The prosecutor allegedly committed misconduct in his cross-

24  examination of Petitioner and in closing argument; and

25  _____

26      [4]   On rebuttal, the prosecution presented evidence that
    [Petitioner] had initially told police he had thrown the gun on
27  the ground.

28

9

1     3.   Petitioner's trial counsel allegedly rendered ineffective

2 assistance, assertedly by: (1) failing to request an instruction on

3 unconsciousness; and (2) failing to call expert witnesses to "assist

4 in substantiating the effects of shock & fear" Petitioner allegedly

5 experienced after seeing Garrett shot.

6

7                   **STANDARD OF REVIEW**

8

9     Under the "Antiterrorism and Effective Death Penalty Act of 1996"

10 ("AEDPA"), a federal court may not grant an application for writ of

11 habeas corpus on behalf of a person in state custody with respect to

12 any claim that was adjudicated on the merits in state court

13 proceedings unless the adjudication of the claim: (1) "resulted in a

14 decision that was contrary to, or involved an unreasonable application

15 of, clearly established Federal law, as determined by the Supreme

16 Court of the United States"; or (2) "resulted in a decision that was

17 based on an unreasonable determination of the facts in light of the

18 evidence presented in the State court proceeding."  28 U.S.C. §

19 2254(d) (as amended); see also Woodford v. Visciotti, 537 U.S. 19, 24-

20 26 (2002); Early v. Packer, 537 U.S. 3, 8 (2002); Williams v. Taylor,

21 529 U.S. 362, 405-09 (2000).

22

23     "Clearly established Federal law" refers to the governing legal

24 principle or principles set forth by the Supreme Court at the time the

25 state court renders its decision.  Lockyer v. Andrade, 538 U.S. 63

26 (2003).  A state court's decision is "contrary to" clearly established

27 Federal law if: (1) it applies a rule that contradicts governing

28 Supreme Court law; or (2) it "confronts a set of facts. . . materially

1  indistinguishable" from a decision of the Supreme Court but reaches a

2  different result.  See Early v. Packer, 537 U.S. at 8 (citation

3  omitted); Williams v. Taylor, 529 U.S. at 405-06.

4

5      Under the "unreasonable application prong" of section 2254(d)(1),

6  a federal court may grant habeas relief "based on the application of a

7  governing legal principle to a set of facts different from those of

8  the case in which the principle was announced."  Lockyer v. Andrade,

9  538 U.S. at 76 (citation omitted); see also Woodford v. Visciotti,

10  537 U.S. at 24-26 (state court decision "involves an unreasonable

11  application" of clearly established federal law if it identifies the

12  correct governing Supreme Court law but unreasonably applies the law

13  to the facts).

14

15      A state court's decision "involves an unreasonable application of

16  [Supreme Court] precedent if the state court either unreasonably

17  extends a legal principle from [Supreme Court] precedent to a new

18  context where it should not apply, or unreasonably refuses to extend

19  that principle to a new context where it should apply."  Williams v.

20  Taylor, 529 U.S. at 407 (citation omitted).

21

22      "In order for a federal court to find a state court's application

23  of [Supreme Court] precedent 'unreasonable,' the state court's

24  decision must have been more than incorrect or erroneous."  Wiggins v.

25  Smith, 539 U.S. 510, 520 (2003) (citation omitted).  "The state

26  court's application must have been 'objectively unreasonable.'"  Id.

27  at 520-21 (citation omitted); see also Davis v. Woodford, 384 F.3d

28  628, 637-38 (9th Cir. 2004), cert. dism'd, 545 U.S. 1165 (2005).  In

1   applying these standards, this Court looks to the last reasoned state

2   court decision, here the decision of the California Court of Appeal.

3   See Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008).

4

5                            DISCUSSION

6

7   I.   Petitioner Is Not Entitled to Habeas Relief on His Claim of

8        Instructional Error.

9

10       Petitioner's trial defenses were perfect self-defense and

11  imperfect self-defense.  The trial court instructed the jury on these

12  defenses (R.T. 366-67, 369-72; C.T. 114-16, 124-25).  Petitioner's

13  counsel did not request an instruction on unconsciousness.  Petitioner

14  contends that the court should have given such an instruction sua

15  sponte.  The Court of Appeal rejected this contention, ruling that the

16  evidence did not support such an instruction, and that any error was

17  harmless (see People v. Doster, 2008 WL 4840984, at *5-6).

18

19       "[I]nstructions that contain errors of state law may not form the

20  basis for federal habeas relief."  Gilmore v. Taylor, 508 U.S. 333,

21  342 (1993); see also Estelle v. McGuire, 502 U.S. 62, 71-72 (1991)

22  ("the fact that the instruction was allegedly incorrect under state

23  law is not a basis for habeas relief"); Dunckhurst v. Deeds, 859 F.2d

24  110, 114 (9th Cir. 1988) (instructional error "does not alone raise a

25  ground cognizable in a federal habeas corpus proceeding").  When a

26  federal habeas petitioner challenges the validity of a state jury

27  instruction, the issue is "whether the ailing instruction by itself so

28  infected the entire trial that the resulting conviction violates due

                                    12

1  process." Estelle v. McGuire, 502 U.S. at 72; Clark v. Brown, 450

2  F.3d 898, 904 (9th Cir.), cert. denied, 549 U.S. 1027 (2006).   The

3  court must evaluate the alleged instructional error in light of the

4  overall charge to the jury.  Middleton v. McNeil, 541 U.S. 433, 437

5  (2004); Henderson v. Kibbe, 431 U.S. 145, 154 (1977); Villafuerte v.

6  Stewart, 111 F.3d 616, 624 (9th Cir. 1997), cert. denied, 522 U.S.

7  1079 (1998).  In challenging the failure to give an instruction, a

8  habeas petitioner faces an "especially heavy" burden.  Henderson v.

9  Kibbe, 431 U.S. at 155.

10

11      The United States Supreme Court has "long interpreted the

12  standard of fairness [contained in the Due Process Clause] to require

13  that criminal defendants be afforded a meaningful opportunity to

14  present a complete defense."  California v. Trombetta, 467 U.S. 479,

15  485 (1984).  Under Mathews v. United States, 485 U.S. 58, 63 (1988), a

16  defendant generally "is entitled to an instruction as to any

17  recognized defense for which there exists evidence sufficient for a

18  reasonable jury to find in his favor."  See also Bradley v. Duncan,

19  315 F.3d 1091, 1099 (9th Cir. 2002), cert. denied, 540 U.S. 963 (2003)

20  ("the right to present a defense would be empty if it did not entail

21  the further right to an instruction that allowed the jury to consider

22  the defense"; (citation and internal quotations omitted).

23

24      Failure to instruct on a defense theory can be error only if "the

25  theory is legally sound and the evidence in the case makes [the

26  theory] applicable."  Clark v. Brown, 450 F.3d at 904-05 (citations

27  and internal quotations omitted); see also In re Christian S., 7 Cal.

28  4th 768, 783, 30 Cal. Rptr. 2d 33, 872 P.2d 574 (1994) ("a trial court

1 | need give a requested instruction concerning a defense *only if there*

2 | *is substantial evidence to support the defense"*) (citation, internal

3 | quotations and brackets omitted; original emphasis).

4 |

5 |     In California, "[u]nconsciousness, if not induced by voluntary

6 | intoxication, is a complete defense to a criminal charge." <u>People v.</u>

7 | <u>Halvorsen</u>, 42 Cal. 4th 379, 417, 64 Cal. Rptr. 3d 721, 165 P.3d 512

8 | (2007) (citations omitted); <u>see</u> Cal. Penal Code § 26, subd. Four ("All

9 | persons are capable of committing crimes except those belonging to the

10 | following classes: . . . Four -- persons who committed the act charged

11 | without being conscious thereof."). "To constitute a defense,

12 | unconsciousness need not rise to the level of coma or inability to

13 | walk or perform manual movements; it can exist where the subject

14 | physically acts but is not, at the time, conscious of acting." <u>Id.</u>

15 | (citation and internal quotations omitted). "If the defense presents

16 | substantial evidence of unconsciousness, the trial court errs in

17 | refusing to instruct on its effect as a complete defense." <u>Id.</u>

18 | (citation omitted).

19 |

20 |     Here, the Court of Appeal determined that the evidence did not

21 | suffice to warrant an unconsciousness instruction (<u>see</u> <u>People v.</u>

22 | <u>Doster</u>, 2008 WL 4840984, at *5). This Court agrees. The only alleged

23 | evidence of unconsciousness upon which Petitioner relies is his own

24 | trial testimony that he purportedly "blacked out" and was not

25 | "thinking clear[ly]" during the shooting (<u>see</u> R.T. 252, 318).

26 | However, Petitioner's testimony concerning the shooting otherwise was

27 | quite specific. Petitioner testified that he saw someone run up to

28 | Garrett's truck and shoot Garrett in the back of the head (R.T. 245).

1  Petitioner testified that Petitioner ran behind the In-and-Out, then
2  jogged back to Garrett (R.T. 246-47).   Petitioner said he noticed that
3  the parking lot was "pretty much empty" (R.T. 247).   Petitioner
4  demonstrated at trial how Garrett assertedly was slumped over in the
5  SUV (R.T. 248-29).   Petitioner allegedly told Garret to "hold on" and
6  lifted Garrett slightly, at which point Petitioner allegedly saw the
7  gun (R.T. 249-50).   Petitioner said he picked up the gun, heard
8  footsteps behind him seconds later, saw someone coming from the back
9  of the truck, "panicked," and started shooting (R.T. 251).   Petitioner
10  said at the time he thought "they" had come back to kill Petitioner
11  (R.T. 251-52).   Petitioner said he fired the first shot to protect his
12  life (R.T. 261).

13

14      Asked whether he saw the person at whom he was shooting,
15  Petitioner said he "kind of, like, blacked out" (R.T. 252).   However,
16  Petitioner did remember the shooting, and admitted pulling the trigger
17  six times (R.T. 252, 266).   Petitioner recalled that the person at
18  whom he shot was a few feet away, at the back of the truck (R.T. 252).
19  Petitioner recalled throwing the gun in the back of the truck after he
20  shot it and Petitioner also recalled running away eastbound (R.T. 252-
21  53).   He denied putting the gun in the SUV's center console (R.T.
22  253).

23

24      On cross-examination, Petitioner said he was trying to protect
25  his life when he fired the gun (R.T. 261-62).   Petitioner said he shot
26  Mabins because Petitioner was "in fear" (R.T. 266).   Asked whether he
27  "blacked out," Petitioner said: "I did.   I panicked.   I was afraid, I
28  mean." (R.T. 263-64).   Asked about the shooting, Petitioner said: "It

1  happened fast.  I turned around.  I wasn't paying attention, really."
2  (R.T. 265).  Asked whether he had the consciousness to pull the
3  trigger, Petitioner responded: "I guess so." (R.T. 265).
4
5       As the Court of Appeal recognized (see People v. Doster, 2008 WL
6  4840984, at *5), except for Petitioner's cryptic statement that he
7  allegedly "blacked out," all other evidence, including Petitioner's
8  own testimony, demonstrated that Petitioner was conscious of his
9  actions at the time of the shooting.  In these circumstances, the
10 Court of Appeal did not act unreasonably in concluding that an
11 unconsciousness instruction was unwarranted.  See People v. Halvorsen,
12 42 Cal. 4th at 418 (trial court properly refused unconsciousness
13 instruction, despite defendant's statement to a doctor that defendant
14 did not recall his crimes; defendant's own testimony made clear that
15 he did not lack awareness of his actions during the crimes, where
16 crimes included defendant's acts of "driving from place to place,
17 aiming at his victims, and shooting them in vital areas of the body");
18 Scott v. Krammer, 2010 WL 1904845, at *37 (E.D. Cal. May 7, 2010)
19 (unconsciousness instruction unwarranted where petitioner testified to
20 details such as identities and positions of those surrounding him, his
21 thought process during the incident, his location, and the directions
22 in which others fled after the shooting).
23
24      Furthermore, and in any event, omission of the unconsciousness
25 instruction was harmless under the standard set forth in Brecht v.
26 Abrahamson, 507 U.S. 619 (1993) ("Brecht").  Brecht forbids a grant of
27 habeas relief for a trial-type error unless the error had a
28 "substantial and injurious effect or influence in determining the

16

1  jury's verdict."  <u>Id.</u> at 637-38.  Here, the trial court instructed the
2  jury that, to prove Petitioner committed murder, the prosecution was
3  required to prove malice, and the court defined both express malice
4  (intent to kill) and implied malice (commission of intentional act the
5  natural consequences of which were dangerous to human life, with
6  knowledge that the act was dangerous to human life) (R.T. 368; C.T.
7  117).  The court also instructed the jury that, to find true the
8  intentional discharge enhancement, the jury had to find that
9  Petitioner intended to discharge a firearm (R.T. 375-76; C.T. 239).
10  As the Court of Appeal recognized (<u>see</u> <u>People v. Doster</u>, 2008 WL
11  4840984, at *6), the jury convicted Petitioner of second degree murder
12  and found the intentional discharge enhancement true, thus necessarily
13  rejecting any notion that Petitioner was unaware of his actions during
14  the shooting.  Furthermore, as discussed above, a "significant amount
15  of evidence countered" an unconsciousness theory.  <u>See</u> <u>Beardslee v.</u>
16  <u>Woodford</u>, 358 F.3d 560, 578 (9th Cir. 2004), <u>cert. denied</u>, 543 U.S.
17  842 (2004) (failure to instruct on unreasonable mistake of fact
18  harmless; alleged mistake of fact would not constitute a complete
19  defense, and in any event "a significant amount of evidence countered
20  the mistake-of-fact theory").  Hence, the failure to give an
21  unconsciousness instruction did not have any "substantial and
22  injurious" effect on the verdict.  <u>See</u> <u>Brecht</u>, 507 U.S. at 637-38.
23
24      For the foregoing reasons, the Court of Appeal's rejection of
25  this claim was not contrary to, or an objectively unreasonable
26  application of, any clearly established Federal law as determined by
27  the United States Supreme Court.  <u>See</u> 28 U.S.C. § 2254(d).  Petitioner
28  is not entitled to habeas relief on this claim.

1   II.   **Petitioner's Claim of Prosecutorial Misconduct Does Not Merit**

2       **Habeas Relief.**

3

4       Prosecutorial misconduct merits habeas relief only where the

5 misconduct "'so infec[ted] the trial with unfairness as to make the

6 resulting conviction a denial of due process.'" <u>Greer v. Miller</u>, 483

7 U.S. 756, 765 (1987) (citation omitted); <u>Bonin v. Calderon</u>, 59 F.3d

8 815, 843 (9th Cir. 1995), <u>cert. denied</u>, 516 U.S. 1051 (1996) ("To

9 constitute a due process violation, the prosecutorial misconduct must

10 be so severe as to result in the denial of [the petitioner's] right to

11 a fair trial."). The Court must consider the entire proceeding to

12 determine whether the alleged misconduct rendered the trial so unfair

13 as to violate due process. <u>See</u> <u>Sechrest v. Ignacio</u>, 549 F.3d 789,

14 807-08 (9th Cir. 2008), <u>cert. denied</u>, 130 S. Ct. 243 (2009).

15

16       A.   **Alleged Misstatements of Evidence**

17

18       Petitioner contends the prosecutor committed misconduct during

19 the cross-examination of Petitioner (Petition, p. 5). Although the

20 Petition does not identify the specific alleged misconduct, the

21 Traverse asserts that the prosecutor misstated the evidence

22 concerning: (1) whether the victim was moving toward Petitioner at the

23 time of the shooting; (2) whether the victim was lying on the ground

24 when Petitioner allegedly shot him; (3) whether Petitioner "blacked

25 out" during the shooting; and (4) whether Petitioner would have shot

26 anyone who appeared alongside the SUV (Traverse, pp. 13-14). The

27 Court of Appeal rejected these claims, ruling that Petitioner never

28 alerted the trial court that he believed the questioning constituted

1  misconduct and never sought a curative admonition (<u>People v. Doster</u>,

2  2008 WL 4840984 at *9).  The Court of Appeal also stated that, in any

3  event, the prosecutor's "vigorous cross-examination" did not

4  constitute misconduct.  <u>Id.</u>

5

6     On direct examination, Petitioner testified that he heard

7  footsteps, saw someone come from the back of the car, panicked, and

8  started shooting (R.T. 251).  On cross-examination, the prosecutor

9  asked Petitioner: "You didn't intend to kill the person you were

10  afraid of coming around the corner of that car?" (R.T. 261).

11  Petitioner replied: "I didn't."  (R.T. 261).  Asked whether he saw the

12  person with a gun, Petitioner said he was not paying attention (R.T.

13  261).  Petitioner said he did not see the person with a knife (R.T.

14  261).  The following occurred:

15

16     [The prosecutor]:  So he wasn't making any aggressive moves

17     toward you, right?

18

19     [Petitioner's counsel]:  Objection.  Calls for speculation,

20     Your Honor.

21

22     The Court:  Sustained.

23

24     [The prosecutor]:  Did you see him making any aggressive

25     moves toward you?

26

27      [Petitioner]:  He was coming at me.

28  ///

19

1    [The prosecutor]:  He was coming at you.  That's not what

2    you said earlier.  You said he came around the corner

3    looking, and you just started shooting.

4

5    [Petitioner's counsel]:  Objection.  Misstates the evidence.

6

7    [The prosecutor]:  That's not true?

8

9    The Court:  Sustained.

10

11   [The prosecutor]:  Your Honor, that's not his testimony

12   before you sustained that.

13

14   The Court:  Ask your next question.

15

16   [The prosecutor]:  You saw him coming around the corner and

17   that's when you said you grabbed the gun, or you had the gun

18   in your hand already and you started shooting; right?

19

20   [Petitioner]:  Yes.

21

22   [The prosecutor]:  So at no time during your examination by

23   [Petitioner's counsel] did you ever say, "He made an

24   aggressive move towards me"; did you?

25

26   [Petitioner]:  No.

27

28   (R.T. 261-62).

20

1  |  Later, the following occurred:

2

3  |  [The prosecutor]:   .   .   .   When he was lying on the ground

4  |  and you were firing the gun, what were you intending to do

5  |  then?

6

7  |  [Petitioner's counsel]:  Objection.  Misstates the evidence.

8

9  |  The Court:  Overruled.

10

11  |  [Petitioner]:  Laying on the ground -- I don't recall even

12  |  [sic] shooting while the person was on the ground.

13

14  |  [The prosecutor]:  So your testimony is that you blacked

15  |  out, right?

16

17  |  [Petitioner]:  I panicked.  I was afraid.

18

19  |  .   .   .

20

21  |  [The prosecutor]:  When a person is lying on the ground

22  |  lying and you're shooting down at him --

23

24  |  [Petitioner's counsel]:  Objection.  Misstates the evidence

25  |  and his testimony.

26

27  |  The Court:  I think there's a little conflict here, about

28  |  what he testified to and what other people testified to.

21

1    So overruled.  In the scheme of things, I'm overruling the

2    objection and you can reask it.

3

4    [The prosecutor]:  When you're shooting down at the ground

5    and Mr. Mabins is lying there with no weapons and helpless,

6    how are you in fear for your life at that point?

7

8    [Petitioner]:  I never -- I never remember shooting

9    Mr. Mabins on the ground.  I don't recall that.

10

11   Q.  How many times did you pull the trigger, Mr. Doster?

12

13   A.  I don't know.

14

15   Q.  Well, you heard testimony that the gun was empty, right?

16

17   A.  Yeah.

18

19   Q.  Did you pull the trigger all six times?

20

21   A.  I didn't pull the -- I don't know how many.

22

23   Q.  Because right now you want us to believe you blacked

24   out?

25

26   [Petitioner's counsel}:  Objection, Your Honor.

27   Argumentative.

28   ///

1    The Court:  Overruled.

2

3    [The prosecutor]:  Right?

4

5    [Petitioner]:  I did.  I panicked.  I was afraid, I mean.

6

7    Q.  Well, I know that's your excuse right now, but what I

8    want to know is what you felt and what you meant to do when

9    you aimed it at a person and just started pulling the

10   trigger.  You didn't even know that that was the assailant,

11   did you?

12

13   A.  I didn't.

14

15   .  .  .

16

17   Q.  .  .  .  You pulled that trigger six times; isn't that

18   right?

19

20   A.  Yes.

21

22   Q.  And each time you pulled the trigger it was aimed at the

23   person we see lying on the ground there, Mr. Mabins; right?

24

25   A.  Yes.

26

27   (R.T. 263-66).

28   ///

1    Later, the prosecutor asked whether it was fair to say that

2  Petitioner "would have shot anyone who came around the corner there?"

3  (R.T. 299).   The court overruled a defense objection that the question

4  allegedly was argumentative (R.T. 299).   The following occurred:

5

6    [Petitioner]:  At the time I was so afraid and in shock

7    panicked [sic] I might have.

8

9    [The Prosecutor]:  What do you mean you might have?  If the

10   person let's try if the person running around the side there

11   were, let's say, a Caucasian white, but dressed similarly,

12   do you think you would have shot them?

13

14   [Petitioner]:  I was panicked.

15

16   Q.  Do you think you would have shot him?  Him coming around

17   the back and the whole situation?

18

19   A.  It's possible.

20

21   Q.  It's possible?

22

23   A.  Yeah.

24

25   Q.  Only possible?

26

27   A.  I was scared.

28  ///

24

```
1    Q.  So there is a difference.  You would have thought about
2    it?

3

4    A.  I wouldn't have thought about it.

5

6    Q.  You would have just done it, that's according to what
7    you're saying?

8

9    A.  Yeah.

10

11   Q.  So if this guy ran around -- page 20, or People's 20,[5]
12   not this person, but that man up there appears to be black,
13   blue shirt, blue pants, dark shoes, you would have shot him
14   too?

15

16   A.  Without -- if he had come around the back of the truck
17   without making his self announced.

18

19   Q.  So they have to announce themselves?

20

21   A.  I mean, yeah.

22

23   [Petitioner's counsel]:  I'm going to object.  It's asked
24   and answered.  And now it's badgering.

25

26   The Court:  Sustained.

27   _____

28       [5]   People's 20 was a photograph showing an overhead view
     of the victim surrounded by medical personnel (see R.T. 218).
```

1 (R.T. 299-300).

2

3      The above-referenced questioning by the prosecutor did not render
4 Petitioner's trial fundamentally unfair.  Petitioner admitted that he
5 had not testified during direct examination that Mabins made any
6 aggressive move toward Petitioner (R.T. 262).  The questions
7 concerning Petitioner's shooting Mabins while Mabins was on the ground
8 did not misstate the evidence.  As the trial court later pointed out
9 (see R.T. 288), Sneed testified that she saw the shooter firing into
10 Mabins while Mabins lay on the ground (see R.T. 136-37).  The
11 questions probing Petitioner's testimony that he assertedly had
12 "blacked out" were not improper.  See United States v. Hinton, 31 F.3d
13 817, 824 (9th Cir. 1994), cert. denied, 513 U.S. 1100 (1995)
14 (prosecutor's questions and comments not improper where they "did not
15 permit the jury to make any negative inferences beyond those which
16 other evidence already abundantly invited").  The questions concerning
17 whether Petitioner would have shot anyone who came around the SUV were
18 proper attempts to probe Petitioner's contentions that he fired
19 because he was afraid or in a state of panic.  See id.  As the Court
20 of Appeal reasonably concluded, the challenged questioning did not
21 effect unconstitutional misconduct.

22

23      **B.   Alleged "Argumentative and Disparaging" Comments**

24

25      Petitioner also challenges some of the prosecutor's questions on
26 cross-examination as "argumentative and disparaging," referencing
27 specifically the following exchange (see Traverse, p. 14):
28 ///

                                    26

1   [The prosecutor]:  You were firing wildly, that's what you

2   want us to believe, right?

3

4   [Petitioner's counsel]:  Objection, Your Honor.

5   Argumentative.

6

7   The Court:  Sustained.

8

9   [The prosecutor]:  You were firing indiscriminately?

10

11   [Petitioner's counsel]:  Same objection.

12

13   The Court:  Sustained.

14

15   [The prosecutor]:  How were you firing, in a panic?

16

17   [Petitioner]:  In a panic, turned and panic -- turning and

18   firing.

19

20   [The prosecutor]:  Waving the gun and boom, boom, boom;

21   right?

22

23   [Petitioner's counsel]:  Objection.  Misstates the

24   testimony.

25

26   The Court:  Stop, Mr. [prosecutor].  That objection is

27   sustained.

28   ///

1  [The prosecutor]:  How were you doing it?

2

3  [Petitioner's counsel]:  Objection.  Beyond the scope.

4

5  [The Court]:  Overruled.

6

7  [Petitioner]:  Turned and shot.

8

9  (R.T. 311).

10

11  This Court agrees with the Court of Appeal ruling that the

12  prosecutor's "tough questioning" was substantially "within the

13  prosecutor's proper exercise of his duty to present the case to the

14  jury" (see Respondent's Lodgment 7, p. 20; People v. Doster, 2008 WL

15  4840984, at *9).  Petitioner previously had admitted that he turned

16  around and "just started blasting," and that he pulled the trigger six

17  times (R.T. 266, 287).  Although some of the questions were

18  argumentative, in context the questions did not deny Petitioner a fair

19  trial.

20

21      C.   **Alleged Misstatement of Law in Closing Argument**

22

23  Finally, Petitioner alleges the prosecutor committed misconduct

24  in closing argument and in rebuttal by stating that one must be

25  "facing down the barrel of a gun" to invoke a defense of self-defense

26  (Traverse, p. 14; see R.T. 391, 412).  Petitioner's counsel objected

27  on both occasions that this statement misstated the law (R.T. 391,

28  412).  In response to the first objection, the court instructed the

1 | jury that, if the attorneys "strayed a little bit from the law," the
2 | jury should remember its instructions, which controlled (R.T. 391).
3 | The second time the prosecutor made the challenged statement, in
4 | rebuttal, the court overruled the objection (R.T. 412).  The Court of
5 | Appeal ruled that the court's admonition cured any potential prejudice
6 | (see Respondent's Lodgment 7, p. 23).

7 |

8 |     Assuming arguendo the prosecutor's comments misstated the law,
9 | the comments did not deny Petitioner a fair trial.  As indicated
10 | above, the first time the prosecutor made the challenged comment the
11 | court reminded the jury that the court's instructions controlled (see
12 | R.T. 391).  The court instructed the jury that, if it believed that
13 | the attorneys' comments on the law conflicted with the court's
14 | instructions, the jury was required to follow the instructions (R.T.
15 | 357).  The jury is presumed to have followed its instructions.  See
16 | Weeks v. Angelone, 528 U.S. 225, 226 (2000).  The Petitioner has
17 | failed to show that the prosecutor's comments denied the Petitioner a
18 | fair trial.

19 |

20 |     **D.**    **Conclusion**

21 |

22 |     For the foregoing reasons, the Court of Appeal's rejection of
23 | Petitioner's claim of prosecutorial misconduct was not contrary to, or
24 | an objectively unreasonable application of, any clearly established
25 | Federal law as determined by the United States Supreme Court.  See 28
26 | U.S.C. § 2254(d).  Petitioner is not entitled to habeas relief on this
27 | claim.
28 | ///

1  III.  **Petitioner's Claims of Ineffective Assistance of Trial Counsel**

2      **Do Not Merit Habeas Relief.**

3

4      A.    **Governing Legal Standards**

5

6          To establish ineffective assistance of counsel, Petitioner must

7   prove: (1) counsel's representation fell below an objective standard

8   of reasonableness; and (2) there is a reasonable probability that, but

9   for counsel's errors, the result of the proceeding would have been

10  different.  Strickland v. Washington, 466 U.S. 668, 688, 694, 697

11  (1984) ("Strickland").  A reasonable probability of a different result

12  "is a probability sufficient to undermine confidence in the outcome."

13  Id. at 694.  The court may reject the claim upon finding either that

14  counsel's performance was reasonable or the claimed error was not

15  prejudicial.  Id. at 697; Hein v. Sullivan, 601 F.3d 897, 918 (9th

16  Cir. 2010) (court may dispose of Strickland claim if petitioner "fails

17  to satisfy either prong of the two-part test").  For purposes of

18  habeas review under 28 U.S.C. section 2254(d), Strickland sets forth

19  clearly established Federal law as determined by the United States

20  Supreme Court.  See Williams v. Taylor, 529 U.S. at 391 (citation and

21  quotations omitted).

22

23          Review of counsel's performance is "highly deferential" and there

24  is a "strong presumption" that counsel rendered adequate assistance

25  and exercised reasonable professional judgment.  Williams v. Woodford,

26  384 F.3d 567, 610 (9th Cir. 2004), cert. denied, 546 U.S. 934 (2005)

27  (quoting Strickland, 466 U.S. at 689).  The court must judge the

28  reasonableness of counsel's conduct "on the facts of the particular

30

 1 | case, viewed as of the time of counsel's conduct." <u>Strickland</u>, 466
 2 | U.S. at 690.   The court may "neither second-guess counsel's decisions,
 3 | nor apply the fabled twenty-twenty vision of hindsight. . . ."
 4 | <u>Matylinsky v. Budge</u>, 577 F.3d 1083, 1091 (9th Cir. 2009), <u>cert.</u>
 5 | <u>denied</u>, 130 S. Ct. 1154 (2010) (citation and quotations omitted); <u>see</u>
 6 | <u>Yarborough v. Gentry</u>, 540 U.S. 1, 8 (2003) ("The Sixth Amendment
 7 | guarantees reasonable competence, not perfect advocacy judged with the
 8 | benefit of hindsight.") (citations omitted).   Petitioner bears the
 9 | burden to "overcome the presumption that, under the circumstances, the
10 | challenged action might be considered sound trial strategy."
11 | <u>Strickland</u>, 466 U.S. at 689 (citation and quotations omitted).
12 |
13 |          B.     <u>Discussion</u>
14 |
15 |          Petitioner contends his counsel provided ineffective assistance,
16 | allegedly by failing to request an unconsciousness instruction and by
17 | failing to call expert witnesses to "assist in substantiating the
18 | effects of shock & fear" Petitioner allegedly experienced after seeing
19 | Garrett shot (<u>see</u> Traverse, p. 15).   These contentions lack merit.
20 |
21 |          First, for the reasons discussed above, counsel reasonably could
22 | have determined that no substantial evidence supported an
23 | unconsciousness instruction, and hence any request for such an
24 | instruction would be denied.   See <u>Rupe v. Wood</u>, 93 F.3d 1434, 1445
25 | (9th Cir. 1996), <u>cert. denied</u>, 519 U.S. 1142 (1997) ("the failure to
26 | take a futile action can never be deficient performance"); <u>see also</u>
27 | <u>Shah v. United States</u>, 878 F.2d 1156, 1162 (9th Cir.), <u>cert. denied</u>,
28 | 493 U.S. 869 (1989) ("[T]he failure to raise a meritless legal

1  argument does not constitute ineffective assistance of counsel";

2  citation and internal quotations omitted).  Moreover, counsel's

3  failure to request such an instruction did not prejudice Petitioner

4  within the meaning of Strickland.

5

6     Second, Petitioner's speculation that an unidentified expert's

7  unspecified testimony could have aided Petitioner is insufficient to

8  show ineffective assistance.  See Wildman v. Johnson, 261 F.3d 832,

9  839 (9th Cir. 2001) (rejecting claim that counsel ineffectively failed

10  to obtain an arson expert, where petitioner "offered no evidence that

11  an arson expert would have testified on his behalf," and "merely

12  speculate[d] that such an expert could be found"); Grisby v. Blodgett,

13  130 F.3d 365, 373 (9th Cir. 1997) ("Speculation about what an expert

14  would have said is not enough to establish [Strickland] prejudice.").

15  Moreover, in light of Petitioner's detailed testimony concerning the

16  shooting, Petitioner has not shown any reasonable probability that any

17  expert's purported testimony concerning Petitioner's alleged "shock &

18  fear" at the time of the shooting would have produced a different

19  trial result.  See Strickland, 466 U.S. at 694.

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

**RECOMMENDATION**

        For the reasons discussed above, IT IS RECOMMENDED that the Court issue an order: (1) approving and adopting this Report and Recommendation; and (2) denying and dismissing the Petition with prejudice.


        DATED:  August 2, 2010.




                                    _____/S/_____
                                         CHARLES F. EICK
                                    UNITED STATES MAGISTRATE JUDGE

1 | **NOTICE**

2 |     Reports and Recommendations are not appealable to the Court of

3 | Appeals, but may be subject to the right of any party to file

4 | objections as provided in the Local Rules Governing the Duties of

5 | Magistrate Judges and review by the District Judge whose initials

6 | appear in the docket number.  No notice of appeal pursuant to the

7 | Federal Rules of Appellate Procedure should be filed until entry of

8 | the judgment of the District Court.

9 |     If the District Judge enters judgment adverse to Petitioner, the

10 | District Judge will, at the same time, issue or deny a certificate of

11 | appealability.  Within twenty (20) days of the filing of this Report

12 | and Recommendation, the parties may file written arguments regarding

13 | whether a certificate of appealability should issue.